Estate of Frank Cohen, Deceased, Lillian Cohen and Milton Horowitz, Executors, and Lillian Cohen v. Commissioner.
Estate of Cohen v. Commissioner
Docket No. 1276-67.
United States Tax Court
T.C. Memo 1970-272; 1970 Tax Ct. Memo LEXIS 89; 29 T.C.M. (CCH) 1221; T.C.M. (RIA) 70272; September 24, 1970, Filed Arthur H. Sobel, 25 Broadway, New York, N.Y., for the petitioners. Agatha L. Vorsanger and Harvey R. Poe, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined a deficiency in Frank and Lillian Cohen's income tax for the year 1960 in the amount of $50,471. Concession having been made, the only issues remaining for us to decide are: (1) whether prepaid interest on a loan, the proceeds of which were used to purchase U.S. Treasury notes, is deductible; (2) 1222 are expenses paid in advance in connection with a cattle-feeding *90 operation deductible as section 162 [1] business expenses; and (3) can the full amount of a payment of estimated State income taxes, in excess of the amount actually owed, be deducted. Findings of Fact Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. At all times relevant herein Frank Cohen (hereinafter referred to as Frank) and Lillian Cohen were husband and wife, and at the time of filing the petition in this case maintained their legal residence in Bayside, New York. Frank and Lillian, employing the cash receipts and disbursements method of accounting, filed a joint income tax return for the calendar year 1960 with the district director of internal revenue, Manhattan, New York. Frank died on March 12, 1968, and, as a consequence of his death, the executors of his estate have replaced him as a party to this action. In November 1960 Frank was chosen by lady luck to have the extraordinary good fortune of winning the Irish Sweepstakes. Frank, otherwise a man of modest means, sought financial advice *91 as to what to do with regard to Federal income taxes to best preserve his $140,362 prize. Pursuant to the advice received from an accountant, Arthur J. Dixon (hereinafter referred to as Dixon), with whom Frank consulted, he entered into the following transactions: On December 15, 1960, Frank purchased U.S. Treasury notes with a face value of $200,000 at a premium price of 104-22/32 and bearing interest at 4 7/8 percent per annum. The notes had a maturity date of November 15, 1964. The total purchase price of the notes was $210,245.51. The purchase of the notes was made through the brokerage firm of Kalb, Voorhis & Co. (hereinafter referred to as Kalb), members of the New York Stock Exchange. Of the $210,245.51 purchase price, Frank paid $10,933.01 [2] in cash, the remaining $199,312.50 being paid with the proceeds of a loan obtained from Kalb. By its terms the above loan was due November 15, 1964, carried interest at 4 1/8 percent per annum and was secured by the U.S. Treasury notes purchased with the funds. As part of the loan agreement the interest at 4 1/8 percent was to be prepaid for the four-year term of the note and was not subject to change during the term. In conformity with *92 these terms, Frank paid Kalb $32,312.50 in prepaid interest on December 15, 1960. The loan agreement between Kalb and Frank was not evidenced by a promissory note but instead was carried as a debit balance in Frank's account with that firm. Four times during the year subsequent to the purchase of the notes the bid price of the notes equalled or exceeded the premium price paid by Frank. [3] The notes, however, were not sold during this period and were held until maturity at which time they were redeemed at par. The funds received in redemption were used to repay the loan, with Frank suffering a loss *93 of approximately $7,000. [4]
With the advice and assistance of Dixon, Frank also entered into a series of transactions involving cattle. Dixon arranged, through Oppenheimer Industries, Inc., for the Atlas Management Corporation, a subsidiary of Oppenheimer, to purchase cattle and enter into feedlot contracts as Frank's agent. Atlas, acting for Frank, entered into Cattle Management Contracts No. 205 KA and No. 204 KA with Anderson Cattle Co., Inc. Contract 205 KA, dated December 10, 1960, provides as follows: This contract is between Anderson Cattle Co., Inc., located at Emporia, 1223 Kansas, to be known as the "FEEDER" and various individuals who will be designated later and who are represented by ATLAS MANAGEMENT CORPORATION, to be known as the "OWNER." The effective commencement date of this contract *94 is December 10, 1960, and its termination date is June 8, 1961, or when all cattle are sold, whichever is sooner. The covenants and agreements to exist between the parties are set forth as follows: 1. PURCHASE OF LIVESTOCK. FEEDER hereby contracts to sell to the OWNER and OWNER hereby agrees to accept from FEEDER 105 head of steers now in the possession of FEEDER for delivery to the feed lot of Anderson Cattle Co., Inc., located in the vicinity of Emporia, Kansas. These cattle shall be merchantable, and shall weigh in a range of 650 to 700 pounds average. If horned upon delivery, animals shall be tipped at the expense of the FEEDER. Both parties understand and agree that the number of cattle stipulated in this contract may vary due to possible death losses and other causes during the period preceding the term of this contract and, should this be the case, contract shall be adjusted on December 12, 1960, to state the correct number of head. 2. PRICE OF LIVESTOCK. Both parties agree that the purchase price of the above described cattle shall be 19 1/2" per pound, plus transportation charges from Breckenridge, Texas. * * * 5. METHOD OF PAYMENT AND FINANCING. OWNER agrees to pay *95 within ten (10) days of the signing of this contract a sum equal to five percent (5%) of the total sales price and to execute a note and chattel mortgage in favor of the FEEDER for the remaining balance of the sales price. This note shall provide for 180 days' interest at 6% to be paid in advance within ten (10) days of the signing of this contract, and the principal sum to be repaid on June 8, 1961. The maker of the note or assigns shall not be personally liable for payment beyond the proceeds of the sale of the animals covered by the chattel mortgage securing said note. 6. RESPONSIBILITY FOR CARE AND MAINTENANCE. FEEDER agrees to feed and care for said cattle in the manner customary in comparable feeding operations, and to pay all expenses connected thereto, intra-ranch transporation, feed, salt, minerals, spray, real estate rentals (if any), labor, and any other expenses not specifically covered elsewhere in this contract. It is agreed that FEEDER is an independent contractor and not the agent or employee of OWNER. FEEDER agreed to hold OWNER harmless if any claim should be asserted (a) for Social Security, Withholding, Unemployment, and other taxes on or measured by wages paid *96 to FEEDER'S workers; (b) for Workmen's Compensation by any of FEEDER'S employees; (c) by third persons because of or growing out of the actions or handling of said cattle while in FEEDER'S custody. 7. LENGTH OF FEEDING. FEEDER agrees to feed said cattle at least 80 days and guarantees an average gain of 2 lbs. per day for said period. After said minimum period, FEEDER shall market said cattle as OWNER will direct. 8. PAYMENT FOR CARE AND FEEDING. OWNER agrees to purchase from the FEEDER the following amounts of feed within ten (10) days after signing of the contract for a price of $6,300.00: 116 tons of silage, 270,000 lbs. of milo and 15 tons of protein pellets. This feed may be used as additional security on the chattel mortgage on the above cattle and this feed is to be used by the feeder to feed the cattle, subject to variations in amounts of feed to be fed as FEEDER sees fit and subject to variations in prices of feed fed. In the event the amount of feed purchased is not fully consumed prior to marketing the cattle, the FEEDER agrees to repurchase the feed at the prevailing market price. If greater amounts of feed are required to feed the cattle, the FEEDER will supply the *97 feed at prevailing market prices. In addition, the OWNER agrees to pay a fee of 8" per day per head for handling and service costs and will pay any transportation costs to or from the yards, personal property taxes, if any and necessary veterinary expenses. * * * 12. TERMINATION PROVISION. This agreement shall terminate automatically, unless the OWNER shall by written notice elect otherwise, in the event that the FEEDER dies, becomes bankrupt or insolvent or makes any assignment for the benefit of creditors, or attempts to sell, mortgage, pledge, remove, dispose of or injure any cattle belonging to the OWNER; or if any distress, execution or attachment is levied upon the cattle or any part thereof. In addition, OWNER shall have the right to terminate this agreement upon three (3) days written notice to the FEEDER if the FEEDER violates any provision of this contract or becomes involved in any financial difficulty which, in the opinion of the FEEDER'S 1224 banking connection may impair his financial responsibility. Upon the termination of this agreement under this clause, FEEDER shall forthwith deliver the OWNER'Scattle in accordance with his directions and OWNER is hereby *98 authorized to enter upon any premises where the cattle or any part thereof may be found, and to take possession of and remove such cattle, and, in addition to possession of such cattle, OWNER shall be entitled to a return of such maintenance funds that may have been advanced that are in excess of the amount reasonably due and payable on the date of termination. Frank, doing business as F-C Cattle Company, received a bill of sale for the 105 head of cattle and the specific items of feed purchased. Contract 204 KA, dated December 14, 1960, provides: This contract is between Anderson Cattle Co. located at Emporia, Kansas, to be known as the "FEEDER" and various individuals who will be designated later and who are represented by ATLAS MANAGEMENT CORPORATION, to be known as the "OWNER." The effective commencement date of this contract is December 12, 1960, and its termination date is June 10, 1961, or when all cattle are sold, whichever is sooner. The covenants and agreements to exist between the parties are set forth as follows: 1. PURCHASE OF LIVESTOCK. FEEDER hereby contracts to sell to the OWNER and OWNER hereby agrees to accept from FEEDER 309 head of steers now in the possession *99 of FEEDER for delivery to the feed lot of Anderson Cattle Co. located generally in the vicinity of Emporia, Kansas. These cattle shall be merchantable, and shall weigh in a range of 925 to 975 pounds average. If horned upon delivery, animals shall be tipped at the expense of the FEEDER. Both parties understand and agree that the number of cattle stipulated in this contract may vary due to possible death losses and other causes during the period preceding the term of this contract and, should this be the case, contract shall be adjusted on December 12, 1960, to state the correct number of head. 2. PRICE OF LIVESTOCK. Both parties agree that the purchase price of the above described cattle shall be 21 1/2" per pound for 152,724 lbs. and 18 1/2" per pound for 139,405 lbs. * * * 5. METHOD OF PAYMENT AND FINANCING. OWNER agrees to pay within ten (10) days of the signing of this contract a sum equal to five percent (5%) of the total sales price and to execute a note and chattel mortgage in favor of the FEEDER for the remaining balance of the sales price. This note shall provide for 180 days' interest at 6% to be paid in advance within ten (10) days of the signing of this contract, and *100 the principal sum to be repaid on June 10, 1961. The maker of the note or assigns shall not be personally liable for payment beyond the proceeds of the sale of the animals covered by the chattel mortgage securing said note. 6. RESPONSIBILITY FOR CARE AND MAINTENANCE. FEEDER agrees to feed and care for said cattle in the manner customary in comparable feeding operations, and to pay all expenses connected thereto, intra-ranch transportation, feed, salt, minerals, spray, real estate rentals (if any), labor and any other expenses not specifically covered elsewhere in this contract. It is agreed that FEEDER is an independent contractor and not the agent or employee of OWNER. FEEDER agrees to hold OWNER harmless if any claim should be asserted (a) for Social Security, Withholding, Unemployment, and other taxes on or measured by wages paid to FEEDER'S workers; (b) for Workmen's Compensation by any of FEEDER'S employees; (c) by third persons because of or growing out of the actions or handling of said cattle while in FEEDER'S custody. 7. LENGTH OF FEEDING. FEEDER agrees to feed said cattle at least 40 days and guarantees an average gain of 2 lbs. per day for said period. After said minimum *101 period, FEEDER shall market said cattle in groups, as he sees fit. In no event shall the feeding continue beyond 180 days. 8. PAYMENT FOR CARE AND FEEDING. In consideration of the care and feeding of OWNER'S cattle, OWNER agrees to pay FEEDER the sum of 22 1/2" per pound weight gain during feeding, based on the weights as provided in paragraph 3, with Fifty-four and no/100 ($54.00) Dollars per head payable prior to December 24, 1960, to be credited on the amount determined to be due at final settlement. The OWNER shall not be required to pay any additional sums until final settlement at termination of this contract. In addition to the amounts above provided, FEEDER shall receive 50% of any profit on this operation as determined by deducting from the sales price the initial cost and cost of feed for said cattle and the following specifically listed incidental expenses; transportation 1225 costs to market and personal property tax, if any. In the event the advance payment proves larger than the amount due on final settlement, FEEDER agrees to refund the overpayment. * * * 13. TERMINATION PROVISION. This agreement shall terminate automatically, unless the OWNER shall by written *102 notice elect otherwise, in the event that the FEEDER dies, becomes bankrupt or insolvent or makes any assignment for the benefit of creditors, or attempts to sell, mortgage, pledge, remove, dispose of or injure any cattle belonging to the OWNER; or if any distress, execution or attachment is levied upon the cattle or any part thereof. In addition, OWNER shall have the right to terminate this agreement upon three (3) days written notice to the FEEDER if the FEEDER violates any provision of this contract or becomes involved in any financial difficulty which, in the opinion of the FEEDER'S banking connection may impair his financial responsibility. Upon the termination of this agreement under this clause, FEEDER shall forthwith with deliver the OWNER'S cattle in accordance with his directions and OWNER is hereby authorized to enter upon any premises where the cattle or any part thereof may be found, and to take possession of and remove such cattle, and, in addition to possession of such cattle, OWNER shall be entitled to a return of such maintenance funds that may have been advanced that are in excess of the amount reasonably due and payable on the date of termination. Frank also *103 received a bill of sale for the 309 head of cattle purchased pursuant to this contract. No mention is made in this bill of sale of any feed. On December 16, 1960, in accordance with the above contracts, Atlas, as Frank's agent, issued checks as follows: Check No.
Payable to
Amount
Purpose
102
Anderson Cattle Co.
$ 1,670.33
Interest at 6% in advance on $55,694.31 mortgage on cattle from contract 204 KA
103
Anderson Cattle Co.
16,686.00
Advance maintenance on contract 204 KA
105
Anderson Cattle Co.
403.30
Interest at 6% in advance on $13,343.56 mortgage on cattle from contract 205 KA
106
Anderson Cattle Co.
6,300.00
Advance on feed purchase per contract 205KA
107
Atlas Management Corp.
2,070.00
Management fee on feeder contract
In addition to the above checks, Anderson Cattle Company received checks of $702.29 and $2,931.28 as the 5 percent downpayment on the price of the cattle in contracts 205 KA and 204 KA, respectively. The total amount of expenses paid by or for Frank, exclusive of these downpayments, was $27,129.63. The cattle were held and fattened until January 30, 1961, at which time 44 head were sold. Sales continued in odd *104 lots until all of the steers had been sold by April 21, 1961. Frank realized a loss on the entire transaction of $1,801.37. On December 13, 1960, Frank paid $15,000 to New York State as payment of his estimated State income tax liability for 1960. An additional sum of $167 had previously been withheld from his salary for State taxes. Frank's actual tax liability for State income taxes in 1960 was $6,074. The $9,093 overpayment was credited against Frank's 1961 and 1962 State taxes and the balance refunded to him in 1962. Frank, on his 1960 income tax return, took the following deductions: (1) $32,312 as an interest expense on the loan, the proceeds of which were used to purchase Treasury notes. (2) $27,130.13 as expenses connected with the cattle operation. (There is an unexplained discrepancy of $.50 between this amount and the individual checks issued on Frank's behalf.) (3) $15,167 as taxes paid to New York State. Respondent disallowed the entire interest and cattle expenses as well as $9,093 of the New York State income taxes. *
Opinion *105 The first issue for decision is whether the interest prepaid to Kalb is deductible under section 163. [5] While that section 1226 appears to allow an interest deduction without limitation, the courts have not read it with such broad scope. Under the case law, interest deductions may be disallowed if the interest expense is incurred solely for the purpose of acquiring a tax deduction. In such cases the indebtedness is not considered genuine and, hence, fails to satisfy section 163. Knetsch v. United States, 364 U.S. 361 (1960). In determining whether a transaction is within the scope of the statute, courts ask the question whether the transaction "can reasonably be said to have an appreciable effect on the taxpayer's beneficial interest." This test was first enunciated in the dissenting opinion in Gilbert v. Commissioner, 248 F. 2d 399 (C.A. 2, 1957), and was subsequently cited with approval in Knetsch v. United States, supra; Goldstein v. Commissioner, 364 F. 2d 734 (C. *106 A. 2, 1966), affirming 44 T.C. 284 (1965), certiorari denied 385 U.S. 1005 (1967); and Rothschild v. United States, 407 F. 2d 404 (Ct. Cl. 1969). This test has been applied in factual settings similar to the instant case in a number of cases. The facts of the Goldstein case, supra, are strikingly similar to the issue now before us. In that case the taxpayer had also won the Irish Sweepstakes and received approximately $140,000. Pursuant to the advice of an accountant Goldstein carried out two transactions, both of which involved the borrowing of money to purchase Treasury securities and the prepayment of interest on the loans. In the first of the two transactions the taxpayer, in December of 1958, executed a promissory note for $465,000 to a bank, securing said note with Treasury 1 1/2's in the face amount of $500,000. The securities and the note were due in approximately 4 years. The note bore interest at 4 percent per annum, and the total amount of interest in the amount of $52,596.61 was prepaid for the 4-year period of the note. The purchase price of the securities was 92.30. After several intermediate transactions, in June of 1960 the creditor *107 sold the securities, satisfied taxpayer's obligation of $465,000, closed the account, and refunded to her a gain of over $10,000. The rates of interest charged the taxpayer during the transaction fluctuated between the original 4 percent to as high as 5 1/2 percent. The second transaction was similar to the first only it involved 1 1/2 Treasury notes with a face amount of $500,000 purchased in December 1958 at 95.6, and $28,800 was paid as prepaid interest. In June of 1960 the creditor sold the bonds at 97.14, satisfied the note, and closed the account. The taxpayer in Goldstein took an interest deduction of $81,396.61 in 1958 against her sweepstakes winnings. The Commissioner disallowed the deduction, and the Tax Court upheld the Commissioner's determination. The circuit court, affirming the Tax Court, said: We here decide that Section 163(a) does not "intend" that taxpayers should be permitted deductions for interest paid on debts that were entered into solely in order to obtain a deduction. It follows therefore from the foregoing, and from the Tax Court's finding as a matter of "ultimate" fact that petitioner entered into the * * * transactions without any expectation of profit *108 and without any other purpose except to obtain an interest deduction, and that the Tax Court's disallowance of the deductions in this case must be affirmed. The taxpayer in Goldstein actually suffered an overall economic loss of $25,019.01. The facts in Bridges v. Commissioner, 325 F. 2d 180, (C.A. 4, 1963), affirming 39 T.C. 1064 (1963), are also similar to the issue before us. Again a loan was taken out and the proceeds used to purchase Government securities. There, as was the case in Goldstein, the interest rate on the loan exceeded that on the securities and the securities were purchased at a discount. The circuit court in affirming the Tax Court's decision in favor of the Government based its decision on knetsch, supra. Citing Knetsch it held that, [The] determinative question as to "whether what was done, apart from the tax motive, was the thing which the statute intended" is answered in the negative if it is apparent "that there was nothing of substance to be realized by [the taxpayer] from [the] transaction beyond a tax deduction." The court in Bridges went on to say that while the basis of the Knetsch decision was that the transaction *109 did not "appreciably affect [taxpayer's] beneficial interest except to reduce his tax," the crucial finding is "not so much what the taxpayer ultimately gets for his outlay, but rather what are the possibilities in that regard under the terms of the specific transaction under consideration." This is to say that an actual loss on a transaction is not a sufficient 1227 ground to deny an interest deduction if at the time it was entered into there was a reasonable possibility that a profit could be made, giving the transaction substance and a potential appreciable effect on the taxpayer's beneficial interest. [6] That a slight or remote possibility of a profit may exist is not sufficient. Nor, do we believe, is it sufficient if a reasonable possibility of a profit does exist but that possibility was not a motivating factor in inducing the taxpayer to enter into the transaction. *110 The Court of Claims has recently considered this issue in the case of Rothschild v. United States, supra. In that case the taxpayer also borrowed funds, purchased Treasury securities, and used them to secure the loans. The interest on the loans exceeded the interest paid by the securities and they were purchased at a discount. While realizing a substantial capital gain on the sale of the securities, an overall economic loss was incurred when the capital gain was matched against the interest that the taxpayer prepaid on the loans. The court in Rothschild stated the issue in that case as being: whether interest paid for borrowed funds to be invested in a transaction which on its face yields no net pre-tax earnings but provides for a built-in economic loss (due to the fact that interest expense is greater than the maximum possible capital gain) is deductible from ordinary income under section 163(a) of the Internal Revenue Code of 1954. In holding that the interest was not deductible the court found that the transaction could not appreciably affect the taxpayer's beneficial interest except to reduce his tax. In reaching this conclusion the court, *111 discussing Lifschultz v. Commissioner, 393 F. 2d 232 (C.A. 2, 1968), affirming a Memorandum Opinion of this Court, a case with facts similar to Rothchild as well as the case now before us, said the following: The court pointed out that the possibility of profit for the taxpayer on the transactions was very remote, and that a comparison of the interest rates on the bonds with those on the borrowed money notes demonstrated the certainty of an initial loss. The fact that the taxpayer did not hold the bonds until maturity, which would have been the only time they could have had any additional value, indicated to the court that "his motive was not to realize a profit but to secure a tax reduction." The court said it was unnecessary to decide whether the transactions were sham since they were entered into without any realistic expectation of economic profit and solely in order to secure interest deductions. It was pointed out by the court that they had held in the Goldstein case, supra, that in similar transactions which were not shams, the payments were not interest within the meaning of Section 163(a) and were not deductible because they "had no substance, utility, or purpose *112 beyond the tax deduction." In the instant case there is no issue as to whether the transaction involved is a sham as opposed to a transaction with substance. Here, as in Bridges, Goldstein, and Rothchild, the transaction per se was of sufficient substance to avert a finding of sham. It is clear, however, that this is not the only hurdle to be overcome by the taxpayer. To be sure, the case now before us contains some factual variances from the cases discussed above. We believe, however, that the only significant difference is the fact that here, as opposed to the other cases cited, the interest received from the Treasury notes (4 7/8) is greater than that paid for the funds used to purchase the securities (4 1/8). This at first glance appears to be a crucial distinction, creating a built-in profit, as opposed to a loss, and presenting a persuasive basis on which to distinguish prior authority. Reflection and analysis, however, reveals the true substance of the instant transaction. The securities in Bridges, Goldstein, and Rothchild were purchased at a discount and thus carried a built-in gain potential at maturity. This, however, was not sufficient to warrant a finding for the *113 taxpayer in the face of the negative interest differential. The increase in market value of the securities necessary to return a significant profit was simply too improbable. In our case, Frank was able to acquire a positive interest differential and consequently had a built-in gain in this respect. To purchase bonds with the high interest rate Frank obtained, it was necessary to pay a premium. 1228 Between the time of purchase and maturity the price of the bonds would decrease to par at maturity. This built-in loss had a potential in excess of the gain to be derived from the interest differential causing the total transaction to yield a loss. While it is true that subsequent to the purchase of the securities their market value was greater than at the time of purchase, we believe this was unanticipated good fortune as far as Frank was concerned and in any case was not a factor inducing him to enter into the transaction. [7] Also in this regard the reasoning in Lifschultz is applicable where the court said: *114 Moreover, as the respondent points out, if taxpayer had been seeking economic gain, he could have held the bonds involved in the first three transactions for brief additional periods until they had risen to par at maturity. The fact that he did not do so indicates that his motive was not to realize a profit but to secure a tax deduction. In the instant case Frank held the securities until they reached par at maturity. If a profit had been Frank's motive, he could have sold the bonds when they were at a level above the price at which he paid for them. That he did not do so, when the normal course is for the price of such bonds to decline as they approach maturity, indicates that his motive was not to realize a profit but to secure a tax deduction. From all the evidence it is our conclusion that at the time of entering into the transaction Frnak's intention was not to secure a profit but, on the contrary, was solely to create a tax deduction so as to preserve his sweepstakes winnings. Further, even if making a profit had been a motivating factor, we believe that the possibility of making a profit was too remote to justify such a state of mind. The taxpayer in this case could not *115 have reasonably expected the transaction to have an appreciable effect on his beneficial interest. Consequently, petitioner is not entitled to a deduction under section 163. [8]
The second issue for decision is whether prepaid expenses made in connection with a cattle feedlot operation are deductible as section 162 business expenses and, if so, whether they are properly deductible at the time they were prepaid. Respondent first contends that the investment in the cattle enterprise made by Frank was not a business within the meaning of section 162 and as such the expenses connected with that venture are not section 162 business *116 expenses. For a financial venture to constitute a business and thus be the basis of deductions under section 162 it is essential that it be entered into with the motive of making a profit. White v. Commissioner, 23 T.C. 90 (1954), affirmed per curiam 227 F. 2d 779 (C.A. 6, 1955), certiorari denied 351 U.S. 939 (1956). At the time of Frank's investment the cattle market was enduring a period of depressed prices. It is the testimony of Dixon that he, and his client, hoped that the market for beef would turn around and result in an attractive gain for Frank. While this result never came about, it is not our function to judge the wisdom of particular investments. [9]
It cannot be said to be uncommon for an individual receiving a large sum of money to seek a business in which to invest a portion of his newly acquired capital. *117 In investing in cattle Frank exposed himself to the risks of that business as well as to the possibility of gain. While the actual loss suffered by Frank was certainly not unforeseeable, we believe that the expectation of a possible profit was also present. There was testimony that this venture was speculative. We agree with this testimony and believe that this transaction was subject to returning a profit as well as a loss. At the time the investment was made the market for cattle was in a declining state and, to be sure, profits would be unlikely should that condition continue. However, 1229 investing in a declining market in hopes of a reversal is an accepted practice in both the stock and real estate markets and we see no reason to reject the practice when the investment is in cattle. This brings us to respondent's second contention with regard to the cattle transactions, i. e., that the payments made for feed were in the nature of deposits and not payments and consequently were not deductible in 1960 but when the actual sale was consummated by delivery of the feed. For purposes of this contention, it is necessary to consider the two contracts involved separately. Contract *118 205 KA provides in paragraph 8 for the purchase of $6,300 worth of feed. Both the quantity and quality of the feed are specified in the contract and the amount charged does not include the performance of any services. There is no provision in the contract entitling Frank to a refund of the excess of the amount paid for the feed. He clearly purchased a given tonnage of feed and should any remain unused at the close of the transaction he had the option of selling it to Anderson or anyone else at the prevailing market value. This cannot be said to be the equivalent of a refund. That no portion of the payment was for services is made clear by the provision in the contract for the payment by the owner (Frank) of 8 cents per day per head for handling and service costs. These factors clearly distinguish this case from Tim W. Lillie, 45 T.C. 54 (1965), affirmed per curiam 370 F. 2d 562 (C.A. 9, 1966). There, on similar facts, the deduction for feed expense was disallowed in the year the funds were delivered to the seller. In that case the Court put great stress on the fact that the payment included future services in the cost of the feed and the fact that sizeable *119 refunds were received by petitioner. As pointed out above, neither of these crucial factors are present with respect to contract 205 KA, and for this reason Lillie is not controlling. We conclude that the specificity of the binding contract is sufficient to justify a holding that the $6,300 paid for the feed was exactly that and not a refundable deposit on feed to be purchased in the future. The payment made by Frank with respect to contract 204 KA is quite another matter. We believe that this was more in the nature of a deposit and hence a deduction must be denied under the authority of Lillie. The provision of the contract calling for the payment of "22 1/2" per pound weight gain during feeding" with $54 per head payable in advance (a total advance payment of $16,686) does not set forth with sufficient specificity that this is an actual purchase of feed. It is clear that future services are included in this payment and that Frank would be entitled to a refund of any remaining balance. Frank did not purchase merchandise with the remittance of $16,686 but instead merely created a debit balance in an account that was to be credited as his cattle were fed and gained weight. For *120 this reason we conclude that this was a deposit and was not properly deductible in 1960, the only taxable year before us. Finally, Frank paid $15,167 to the State of New York in payment of his State income taxes for taxable year 1960. His actual liability proved to be $6,074. However, the $15,167 closely approximated what his tax liability would have been considering his sweepstakes winnings and not taking into account the deductions discussed above. Cash basis taxpayers are allowed to deduct State income taxes when paid as long as the payment is made in good faith. Lowenstein v. Commissioner, 12 T.C. 694 (1949), affirmed sub nom First Nat. Bank of Mobile v. Commissioner, 183 F. 2d 172 (C.A. 5, 1950), certiorari denied 340 U.S. 911 (1951). In paying State income taxes it was Frank's intention to pay the maximum amount of tax that he might be liable for. While it is not clear to what extent the transactions resulting in the deductions were finalized before the payment of State income taxes, it is clear that the payment was made prior to the time the note and cattle transactions were actually entered into. That litigation was required in resolving *121 the issues above decided indicates that their deductibility was sufficiently questionable to warrant an attempt by Frank to cover the highest possible State tax liability. On the facts of this case we believe that Frank made the payments in good faith and should be allowed the deduction. Decision will be entered under Rule 50. 1230 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. It was originally intended that the downpayment would be $10,245.51 and the loan $200,000. However, in prepaying the interest on the loan Frank remitted $33,000 when owing only $32,312.50. The $687.50 excess was treated as a repayment of principal or additional downpayment reducing the loan outstanding to $199,312.50.↩
3. Pursuant to "The Commercial and Financial Chronicle" letter entered in evidence, bid prices for 1964 4 7/8 Treasury notes on December 31, 1961, and 1960, January 15, 1961, March 31, 1961, and April 30, 1961, were 105-6/32, 104-22/32, 104-22/32, and 105-6/32, respectively.↩
4. This figure is reached in the following manner: ↩
Proceeds from redemption
$200,000.00
Repayment of loan 199,312.50
Retained by Frank
$ 687.50
Positive interest differential at 3/4% for 4 years 3,000.00
$ 3,687.50
Cash paid down on notes 10,933.01
Loss to Frank
[7,245.51) This figure is inexact since interest is subject to tax, and the time span was not exactly 4 years.
*. By official Tax Court order, dated 10/1/70 and signed by Judge Fay↩, this sentence was changed to read as above. - CCH.
5. SEC. 163. INTEREST. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩
6. It should be noted that the term "beneficial interest" is necessary in this context. One may incur an indebtedness and use the funds for personal purposes (e. g., purchase a house) or for business purposes other than to make a profit. A transaction must have a possibility of resulting in a positive economic change. On the facts before us the only feasible economic change would manifest itself in the form of a profit.↩
7. Had the bonds been sold upon reaching this unexpected high point an overall loss would still have resulted if we take into consideration the cost of Frank's tax advice.↩
8. For additional cases with similar facts reaching the same result see James A. Collins, 54 T.C. 1656 (August 27, 1970); Barnett v. Commissioner, 364 F. 2d 742 (C.A. 2, 1966), affirming per curiam 44 T.C. 261 (1965), certiorari denied sub nom. Goldstein v. Commissioner, 385 U.S. 1005 (1966); and Ippolito v. Commissioner, 364 F. 2d 744 (C.A. 2, 1966), affirming a Memorandum Opinion of this Court, certiorari denied sub nom. Goldstein v. Commissioner, 385 U.S. 1005↩ (1966).
9. It should be noted that this case is to be distinguished from the "hobby loss" cases. When a hobby loss is involved the key question is whether the investment made is for personal or business purposes, whereas here there is no personal purpose. The need for the sceptic eye cast on hobby cases is not present here.↩